at all, No. 14-3509. Mr. Checkin, is that? Yes, sir. And Ms. Boyer-Cohen. Take your time. Welcome to the court. My name is Stanley Checkin. I represent Natalie Monroe in the matter of Monroe v. Central Bucks School District. This is a First Amendment retaliation case that was brought in the Eastern District. Judge Ruth dismissed the matter on summary judgment, concluding that under the Supreme Court case of Pickering v. Board of Education, my client did not exercise free speech rights in a manner in which the First Amendment would provide protection. As I get it, the district court found this was an area, the speech did touch upon an area of public concern, but rather minorly. So that the, just tell me if I got the district court right, if I'm saying what the district court did. And then did the balancing and found that there were no, that this was not protectable speech. But it first found there was a minor matter of public concern and then found the balancing did not go in that direction. Have I got the district court right on this? Almost. Almost. First of all, I would like to reserve three minutes. I was just going to ask you. Thank you. The only issue, Judge Rustoni, that I would take with your rendition is I don't believe the judge used the words minor or even intended to. I think what the judge was doing was responding to defense counsel's argument that the vast majority of the blog entries had nothing to do with speech. The court agreed with that, but said that there were entries, blog entries that did touch on matters of public concern. And therefore, she would have first amendment rights if those rights survived the Pickering balancing test. So the court specifically found that the matters touched upon public, matters of public concern. The court identified those social and political. I think the court missed some of them as well. But we are here because of the application of the Pickering balancing test. The blog was nine people, including Ms. Monroe and her husband. Why didn't you focus more on the news media problems that came up afterwards as opposed to the blog? Isn't that much more a matter of public concern than the blog? First of all, we did focus on both. It's focused on them in the trial court, focused on them in the appellate brief. Why didn't you include the substance of Ms. Monroe's news interviews in your motion for summary judgment or include in the record on appeal? Well, I think that I don't believe it's necessary to include those. We did include essentially characterizations of what was discussed in those appearances. But if you had a blog and you're saying that a student is an airhead and a lot of other complaints about students, and maybe a complaint about a generation of students, who knows. But when you go on television, it would seem you're then saying, hey, wait a minute. This is a matter of very significant public concern. The question is, what can a teacher do in her private time, et cetera, et cetera? And that would seem to be because, especially because you were on Good Morning America. If that's not just local public concern, that's national public concern. Why not focus on that as opposed to having to play a defensive game as to whether these blogs actually dealt with anything of public concern? Well, Your Honor, strategically, having heard Your Honor's question, I wish I had done it that way. But I don't believe there's any factual dispute as to whether she appeared on those news channels. Or in terms of what she said, the issue here comes down to the trial court's application of the Pickering balancing test. And this case does not come down to whether or not my client spoke on matters of public concern. It was so little in the district court opinion, in a very comprehensive opinion otherwise, that the only time that I really saw this dealt with substantively was in footnote 65 that said, well, if it was dealing with the news media coverage, et cetera, I would rule the same way. Right. And I want to point out to Jambro that the school district spoke to the press first. The first interview given in this case was given by Defendant Lukobot, the principal. The same day he suspended my client, he gave an interview about her blog. So there's no doubt that this entire incident touched on matters of public concern, and there is protectable free speech. You're going a little too far there. Overwhelmingly, her statements did not deal with matters of public interest. There were some genuine public interests, but overwhelmingly her comments had nothing to do with public – her gripes with the students and her work and so forth. And the Pickering test requires a sliding scale. I mean, you can't have one little thing dealing with public concern and then all this personal vindictiveness spew forward. What she did here is, in effect, cherry pick a couple of things that she said about public concern, but the vast majority of her comments, her blog, deal nothing with public concern. Right. And none of the – does everyone know what a blog is? Yeah, sure. Okay. So she blogged for 13 months. The only thing I know is I ain't never going to have one. Okay. He's not allowed to have one. He's not doing anything. And incidentally, the school district did not have a policy against blogging. But she has, I think it was 84 blog entries, most of which had nothing to do with anything that would interest The Huffington Post or CNN or any news organization. There was one blog that went viral, one, a single one. No one cared about the other blogs until they read the first. Then they said, well, let's read them all and see if anything's interesting. Your Honor, to weigh – it would be as if reading the very short Gettysburg Address, you then considered everything else Abe Lincoln said that day to decide whether the speech outweighed his breakfast. There was one blog that was of interest. Yeah, but the blog is part of what she's spewing forward about the school system, about her students, and it's something that was brought up in the public, the whole thing. Well, the whole thing was not brought up in the public. What was brought up in the public was the blog in which she blogs about what she'd rather be putting on report cards instead of what she – it's suggested by the principal that she put some report cards. That's what was interesting. And that was inflammatory. Some people liked it, some people didn't like it. And I would suggest if you have an opinion about it, it's free speech. But here's why it's – here's why it is so particularly free speech. It's because you have a public school teacher in her private life talking about the vagaries of problems in an affluent suburban public school. Her opinion matters. And that's how much of what she spewed out, including in the blog, really dealt with matters of public concern. If we're dealing with a sliding scale in the Pickering test and looking at her entire speech and her blog and so forth, what percent dealt with public concern in your estimation? My estimation are 100 percent of the blog that brings us here today because her pie recipes, her movie reviews had nothing to do with the fact that this went viral. And to weigh – and these are, again, over the course of 13 months. Why do you say – Because nobody cares about what a public school teacher's pie recipe is. Well, they obviously read the – looked at the blog. No, no, Judge. The initial news media and the first time I ever read a case was on the Huffington Post. It was real simple. School teacher writes blog about what she'd be like to put on – How did this blog become public, the Natalie M. blog? We don't know for sure, but a reporter contacted the school district and said, have you heard about this blog? And the school district went on to the blog. It's actually hard to find a blog unless you know the title, what's it typed in. And they found it. They printed out all the entries and said, did you write these? She said, yes. You're suspended. Then they give an interview. Then she starts giving interviews. Every major network, Fox, every major print organization, international. And remember, Your Honor, I cited from the school district's own press conference, when they decided to bring her back from her suspension, they indicated that it's inappropriate for her to be blogging about students and refusing to apologize. They wanted to apologize on TV. That's what they were mad about. Well, suppose you were a parent, had a kid at that school, and you have a teacher who has absolute demeaning conduct and opinion concerning students generally, and some students are not as sharp as others. As a matter of fact, a lot of the parents didn't want their kids to be taught by her. Well, I'm a parent of kids in school, and I can tell you that the parents' opinion of teachers is generally not solicited in advance. It was an extraordinary situation. You have a different school system I'm in, let me tell you. Did you get to choose your children's teachers in advance? No, but we certainly gave our opinions to them. I do the same, but here's how I do it. I say, you know, I'd like a teacher who is calm. I'd like a teacher who listens to the student. I don't handpick a student. That's what happened here. The school district told the parents, if you object to Ms. Monroe, let us know in advance, we'll give you someone else. That's extraordinary. That was an act of retaliation. Would you want a teacher who would describe her students as rat-like? You know what? She didn't describe her students as rat-like. But here's what I can tell you, Your Honor. She taught school the next year. The school district itself gave her three classes. And, Your Honor, you keep describing this test as a balancing, as a sliding scale test. I haven't seen it described that way, but here's the problem. They have nothing on their side, literally nothing, on the government side, to balance against her free speech right, because they have to show disruption, disruption to, and they could show that if she was standing outside the school telling students, don't go, don't go, don't go. They had a chance to show disruption by saying that 100 students opted out from the class in the fall. And what about the 30 that didn't and were taught and received an education? Yeah. Could they hold them back? 100 out of 130 is a very significant percentage. You would not allow, Your Honor, if you were a school superintendent, you would let a single student. I think the argument to what I just said is, but that's not what they did. That's correct. They allowed students to be taught by her and because there was literally no disruption. She taught the curriculum. She didn't stand up in class and say, I'm not teaching that curriculum. Don't take tests. She taught the curriculum she'd been teaching for years. She was awarded tenure after she wrote these, after she wrote these blog entries. They discovered the blog entries after they were awarded tenure. This was a qualified, competent teacher with phenomenal reviews. She got tenure in what, in 2009? I'm sorry? She got tenure in 2009. She received tenure in 2010. 2010. The blog, in January. The blog entries were discovered in February. So it was a year, 15 months before. I'm sorry, she received tenure in March 2010. And uniformly outstanding reviews go to uniformly terrible reviews. They didn't fire her for writing this blog. They fired her for incompetence. She became incompetent after they discovered the blog. Well, there was some evidence that they sat on that for quite a while. But one can make an argument that she should have been terminated for incompetence. And that's an argument that you should hear, Your Honor. And that's the problem here. Well, that's not the argument for the court. And the question is whether or not you have enough public interest vis-a-vis the other information that she spewed forward. And including the blog, what percent of what she said was of the public interest? Certainly you're not saying her criticism of students is the public interest. I think that's absolutely the public interest, Judge. Judge, it's her view. I'm sorry. I'm willing to look at the whole blog and say these particular statements are what we're looking at. And so we ignore the thing about the elliptical machine and all that nonsense. But the question is the context of those particular statements. Interdictive, et cetera. And here's what I know of. I'll get to this if I recall. No, it's okay. I interrupted Judge's question. I'm sorry. And Judge Ruth, who is a very competent trial judge and does very recent opinions, did not have the benefit of the Daugherty case. Came out two months after her opinion. The Third Circuit has very recently spoken. The Daugherty panel assumed that what the plaintiff said was a matter of public concern. But the test is the issue I'm having with the court's questions right now. That case was mostly about whether this was the employee's duty or not duty, right? Well, the factual circuit was a whistleblowing case. Someone was fired for whistleblowing. One of the issues was whether it was official speech or citizen speech. That's not the entire holding, though. The question comes down to how did the Third Circuit apply the Pickering balancing test? This is not an amorphous test. This is a test where interest in the public and in the speaker, in free speech, are weighed against interest in the- Okay, that's what I want to get to. Give me your one-sentence definition of speech which is in the public interest. What is your definition? Well, my definition of speech that is in the public interest is- Yeah, in light of Pickering. Public concern. Public concern, which incidentally, the trial could agree with me on. So we're not narrowing- Public concern. Oh. Give me your definition of what is your definition of public concern. Things that involve a citizen's view, and this is the law, and it's the scriptural and social- I want to hear you tell me what the law is as to what a public concern is. Anything that is interesting to anyone, not the majority of people, to anyone on matters of social, political, or economic, and that's the law. And that's clearly here. Anything of interest to them. Anything socially, politically, economically, that is of interest to people. That's the easy part of the case, where the judge got hung up and by our ear is on the balancing test that arises. What we need to be focusing on here is whether there was evidence of disruption that can outweigh the public interest. Your Honor, the public was so interested in this that she was asked to appear on every major network. Incidentally, the government itself provided an interview. This was extremely interesting. So now the question is, does the inflammatory nature outweigh her rights? That's not even the test. And I know everyone's focused on that. That's not the test and pickering. The pickering is, does governmental disruption outweigh her interest in speech? And there was none at all. Literally none. They brought her back. The government disruption argument was a trial tactic, a successful one. We'll get you back on rebuttal. Thank you. And we'll hear from Ms. Boyer-Cohen. Good morning, Your Honors. May it please the Court, Kimberly Boyer-Cohen for the appellees. Let me just start at the beginning. When was Ms. Monroe dismissed on February 9, 2011? At that point, I think the school district was attempting to figure out what to do with her. She was actually due to go out on maternity leave at any time anyway. But you've got the superintendent, you know, between, what, the 11th and the 17th on three occasions essentially saying we need a terminator. That's correct. And, again, she was on maternity leave. They did decide to Well, she went on maternity leave on March 1, right? She went out on maternity leave. That became the official date. She was suspended, and then they allowed her to take her maternity leave. So was she teaching classes in early February? No, she was not. Well, up until February 10th when they discovered the blog on February 9th. And on February 10th, they brought her in to ask her about it. And she was suspended, but she wasn't terminated. They talked about terminating her, but then put out a statement that she had a right to say what she had to say. They kept her. She asked to transfer on August 4. They said no. She comes in, and she gets, I guess in June, the following January and the following June, three unsatisfactory reports, and then they terminate her, despite the fact that every report that she had gotten from 06 on was quite glowing. 06 to, excuse me, 06 to 322. And given tenure. And given tenure. I mean, that's a big thing. And a major recommendation from Mr. Lucabaugh with regard to getting her graduate degree. That's correct, and all of that happened before she got tenure. She, by all accounts, did a great job before she got tenure. But it's clear even from her blog, if you look back, she was counting down the days, and she was counting how many excellent reviews she needed to get before she got it. And unfortunately, once she got tenure, that's where it started to go downhill. Some of this thing is about her becoming disenchanted, which was the issues about which she uttered speech that had some public concern. To me, there's two issues in this. I mean, if we get past Pickering, she's going to trial. I mean, because who knows why she got fired. But the one is, if she said something that was of public concern, does the fact that she said it was invective in a disrespectful way that you would not want to hear teachers talk in public, does that matter? And two, what was the disruption? And the fact that all these parents said they chose not to have her, it was after they were solicited, is that really disruption? Those are the two issues that kind of percolate with me. First, I would say we do disagree that any of this touched upon a matter of public concern, simply because it became an issue of public concern,  Well, you don't think the fact that students aren't paying enough attention to the testing, that students aren't putting forth effort, those things, you don't think that's a matter of public concern, that they're spoiled and therefore not working hard and we need to encourage them to work harder? Isn't that a matter of public concern? I would contend that no, simply because that was her feeling on the specific students that were in her class, does not make it a matter of public concern. It makes it purely a private grievance that she has. Why don't we assume that the lack of performance by students and students not working up to their ability and students in general being coddled is a matter of public concern? Assuming it's a matter of public concern. You do have to look at it. Plaintiff's counsel went on about how the rest of the blog doesn't matter. But it does. Because the test in order to determine whether it was a protected speech, you have to look at the context, content, and form. We have to look at all three of those things. And that includes the entire blog. The context of the blog would be, the context means the circumstances or facts surrounding an event. And in this case, this blog, by her own admission, was simply intended to serve as a vehicle to keep in touch with friends. She had nine people subscribe to it. And it was a way for her to vent about her feelings. The form was, again, a personal blog. She thought it was private. She did not intend for it to get out. She didn't intend for anybody to read it other than these nine subscribers. She never meant it as a public forum on anything. And if you look at the blog as a whole, it shows that mindset. I mean, there's an entire section talking about the horrible people that were in her meditation class. And it shows her mindset as to her disenchantment with everything and that she just used it as a vehicle to complain to her nine people. What about the news media interviews? This was now national attention. Does that make a public concern? The fact that it received such national review. Just because the blog, because her situation became a matter of public concern does not mean that her speech was a matter of public concern. But the question then becomes to what extent do teachers have the right to comment on their students and the school system, and that's a matter of public concern. That's why I keep asking. I'd like to have seen significantly more evidence put in of what actually was said before in the news media. Because the matters are on YouTube, a number of them already. If she was speaking as to the school system as a whole, it may have. But she was not. She never tried to bring this to the public's attention. Do we know that? Well, if you look at the blog. No, no, I'm talking about the news interview. The media accounts, unfortunately, the plaintiff did not make them part of the record. The only thing that's in the record is what's there. Well, they made a complaint about it, and Judge Roof did deal with it, albeit only in a footnote. But it's the plaintiff's burden to show the contents, and he didn't. There's nothing in the record except for bits and pieces as to the contents of that. The school district was contacted by a reporter because the reporter found a blog where a teacher was spewing vitriol about her students, and some of it made the students recognizable. Like certain passages, a student could go in and look at it and know that she was talking about that. Now let's go back to Judge Roof's point. Let's just assume something happened that was of public concern, be it a blog or be it news media. To do the Pickering analysis, you have to terminate that person as a result of the disruption. That was not done here. She was not terminated as a result of disruption. Correct. First, if I could just finish answering your question about the media. The only thing that's in the record with respect to the media is to show that her self-stated purpose for speaking to it was not to ignite a national debate, not to talk about matters of public concern. She testified that she felt it was necessary to share my side of the story. That's why I went to the press, to defend my professional reputation as an educator. All she was doing was trying to protect herself. She wasn't trying to talk about anything of public concern. But that in itself, when you look at the test, and I think you quoted it correctly, for what is a matter of public concern, if the content, form, and context establish that the speech involves a matter of political, social, or other concern to the community, the fact that this was out on national news shows that it was of social or other concern to the community. Does it not? But we're looking at her speech, not the situation. And that's what's getting lost in this. The situation. But her speech to the news media was a different, you have a context of, you know, what rights do teachers have, et cetera, et cetera, to have a blog. That is a matter of, I mean, it's a fairly low threshold of public concern. It's not an issue of whether she was permitted to have a blog. It's an issue of whether the statements she made in that blog were protected speech. And her comments to the media were, again, geared solely towards her reputation. All she kept saying was, I didn't do anything wrong. I didn't do anything wrong. She wasn't trying to say, you know, something, education today is terrible, and we need to talk about this. What did the principal, Luca Baugh, say to the press? Again, most of this is not in the record. I don't, he basically, I think, discussed that she was on suspension, which she was, because, you know, she had made these comments. I mean, it would, okay, it would seem as if some of these things aren't in the record, although at least something is, because we have the district judge saying that it wouldn't affect her decision on the Pickering analysis. Then should that record not be made full and then give the district judge another opportunity to determine whether Pickering analysis, who wins under that? Your Honor, at this point, I would say it's too late. The plaintiff had their chance. They had a record. They developed their record. They submitted everything that they thought was necessary. But Judge Ruth did say that this was a matter of public concern on the blog, correct? She said it occasionally touched upon a few issues, and those she narrowed down to. But she did not say, she didn't say, I'm not going to Pickering analysis. She didn't assume it. She said that she found that the blog. Well, she first found that, I mean, we're combining many steps of the Pickering analysis here. First, you have to determine whether the issue touched on an issue of public concern. And, again, Judge Ruth simply generally and without any statement said. Did she say that it did not touch on a matter of public concern? She said occasional passages touched on matters. So that makes it, you know. It does not make it protected speech, though, because even if it touched on matters of public concern, you need to determine whether it's protected activity. Well, then you do your Pickering analysis, do you not? Right. But her saying that occasional passages touched on public concern does not automatically grant First Amendment protection. Judge Ruth then did what she was supposed to do, and she looked at whether or not, you know, looking at the content form and context, whether it was protected activity. She found that it was not. If you looked at it as a whole, if you looked at what was said, if you looked at the manner in which it was said, if you looked at the audience that it was directed to, it wasn't. All right. You terminated her for poor performance, didn't you? Yeah, I mean, that was the point that I really want to get on. Let's get off of the public concern for a second. Assume for the moment, back to Judge Rustone's point. Let's assume for the moment that something here dealt with public concern. And let's assume we do the Pickering analysis. Pickering analysis is do you have disruption versus speech, which comes out as a policy matter higher than the other. The trouble here is, well, it would seem that you had the opportunity to dismiss this employee in February of 2011. You had the opportunity, perhaps, to do so a second chance in September of 2011 when 100 kids would not take this class and they probably had to hire another teacher. But instead, you, in effect, waived that chance and said, nope, this has nothing to do with Pickering. This has to do with this person's performance. And in that context, I don't know who's right, but one could have a suspicion that it was pretext. I'm not saying it is or it isn't. One could have a suspicion. And those are the issues that are typically decided by a jury, not a court. That's correct. Generally, the causation argument, so to speak, is a question. And if she terminated for poor performance, why did you give her tenure? You let her teach for another year? Again, the tenure happened before the poor performance. As soon as she got tenure, her performance went downhill. Even before the blog was discovered, they were getting student complaints about her being inattentive, her watching her nanny cam during class, about her not actually teaching. And that's an issue that the jury is going to have to deal with. Why should we not follow what the Second Circuit did in two cases, called Shepard, which is at 96F3rd, page 823. And on page 827, it reads, even if the potential disruption to the office outweighed the values of the speech, the employer may fire the employee only because of the potential disruption and not because of the speech. That is to say, it matters not that the potential disruption outweighs the value of the speech if the employer subjectively makes speech the basis of the termination decision. Such retaliatory discharge is always unconstitutional, and that was in effect affirmed seven years later in a case called Meltzer, M-E-L-Z-E-R. And if what happened here is you had the opportunity to terminate as a result of the disruption, but you forewent that opportunity not once but twice, are we really not beyond, really outside the First Amendment, if you will, or this person, was she terminated because of her speech, when she was still in the First Amendment, I guess, or was she terminated because she became a bad teacher? Well, Your Honor, I would say that it's all of that. It's, again, the overall, may I? Yeah, you certainly may. It's the overall circumstances. Keep Margie at about three minutes on, please. It's both. I mean, it was also the disruption. I mean, you talk about the Pickering test. They never said it was. To rely on Pickering, you've got to rely on disruption, and they let that go. Well, right now we're just looking at whether her speech is protected, and her speech did. I understand. Her speech, but we have to look at the factors as it relates to her speech, not as it relates to when she was terminated, as it relates to her speech, and the issues are whether it impairs harmony among coworkers. She named a coworker, and pardon my language, called him a douche. The detrimental impact on close working relationships, Your Honor, Judge Amber, you cited. That's not why they terminated. But you cited Meltzer, and Meltzer actually said that teaching by its very nature requires a degree of public trust not found in many other positions of public employment. Meltzer also says, by the same token, when the government prevails in the balancing test, so even if you prevailed, the employee may still carry the day if he can show that the employer's motivation for discipline was retaliation for the speech itself rather than any resulting disruption. But the speech itself in this case was not protected, and that's why we have to look at the factors. Again, Judge Ruth didn't actually address the issue as to why she was terminated, because that is, as Judge Cowen said, generally a question of fact. This is not protected speech in your view. Okay, the Pickering test, what kind of test is it? Am I looking at an objective test? What is it? It is a question of law based on the facts of the circumstances of the case. Okay, so it's a question of law. So you look at the words, the context, form, and content of those words, and then you see whether these kinds of words are inherently disruptive? You determine whether the speech is protected by looking at the content, form, and context of the speech. If that then becomes an issue of public concern, looking at all those factors, then you have to look at whether the employer had an adequate justification for treating the employee differently from any other member. And that's when we look at the Pickering balancing test. Well, actually the Pickering balancing test comes into whether the employer had an adequate justification. And the balancing test is, again, there's four factors to look at. It doesn't have to meet all four factors. You have to balance the employer's interest versus the employee's interest. And in the school setting, they've also looked at whether or not the statement interfered with the employee's proper job performance or with the overall operation of the school. And in this case, both of those things happened. But the 2011 evaluation, which gave her an unsatisfied rating, was in large part by reason of her blog. So is there a genuine issue as to whether speech constituted a factor, a substantial factor in her termination, as well as whether your client would have acted the same way in the absence of speech? Your Honor, if you actually look at it, the blog was not the large part of her getting a bad. Well, the evaluation in 2011, I think you can fairly say, was in large part by reason of the statement she made to blog about her students. Your Honor, no, because prior to that, they had received student complaints that she admitted were true. And she was warned about that. She was placed on a warning. She was told that she had to meet certain criteria. And then, for example, in October 2011, Mr. Lucabaugh was walking past a classroom. He didn't know it was Ms. Monroe's classroom. He noticed students talking on their cell phones, saw an object being thrown across the room. He went in. There was nobody in there. He waited five minutes before she came back. The school rule is you need to have someone in the classroom at all times. So there were lots of things that did not relate to the blog. You're sticking by your guns here, that she was terminated by reason of what? Poor performance or by reason of a balancing test under Pickering. Which one? Where are you? Well, the balancing test doesn't… Why was she terminated? Let me answer. Why did the school… What was the reason the school terminated? Poor performance, right? And disruption to the school. But the Pickering test doesn't relate to her termination. It relates to the protected schools. Now, hold on. She was terminated because of disruption? Where did it say that in the termination letter? She was terminated for her overall performance and issues. What did the letter say? And because 100 students dropped out of her class, she couldn't teach anymore. What did the termination letter say? I believe that it talked about her performance. But the Pickering test doesn't look at termination. You know what? Let's assume you're right, that there also was something else in there. Isn't that really a jury issue? It's not, Your Honor, because the Pickering test doesn't relate to why she was terminated. It relates to her speech. They're two separate issues. The Pickering test is looking at the speech and whether the speech was disruptive. And it's to determine whether the speech was protected. And if you don't bring up disruption to counteract the speech but decide to go off on another tack, another path, haven't you, in effect, given up making a Pickering analysis here as a defense to your actions? I would respectfully disagree, Your Honor, because they are not looking at the same thing. They're different parts of the equation. Pickering looks solely to the speech and the speech's effect to determine whether it's protected. It does not look to – the Pickering test is solely a question of law. And we've all determined that the reason for termination – that putting aside the fact that we fired her for her otherwise bad performance, this – what she did was disruptive to the school, and you put in affidavits about what happened, and that although we fired her for this reason, this speech was not a protectable speech because of the – if we had fired her for this speech, it was okay. It wasn't protected. That's what you did before the district court, right? Correct. The speech was not protected. Yes, you put in an affidavit saying this happened at the school or you did depositions. This happened. And so, yes, we fired her because of poor performance. Part of that might have been all related to this speech. But apart from that – Before you get to why she was terminated, you have to look at the speech. Okay. Well, here's a jury question here as to whether she was terminated by reason of poor performance or because she spoke out in matters of public concern. And why is there – why can't a jury – that could be a jury question. Why is that opposed to resolution here? That could be a jury question. However, we don't get to that because the speech is not protected. In order for it to be a jury question, you have to find that there was protected speech first. If there's no protected speech, she can be fired for – Nothing she said is protected. Is that your – That is. Considering the context form of the blog, considering the disruption to the school, not one thing that she said is protected speech. That's their argument. Thank you. We don't get to step two. Or three.  I wanted to maybe even start with that because the point being that, okay, let's assume something is a matter of public concern. But for it to be protected, it has to also get through a pickering hurdle. And the pickering hurdle is look at the potential disruption of the speech versus the – I'm sorry, the potential disruption to the school versus this person's right to say what she said. I almost agree with – that I don't agree it's potential. I think it's disruption. Not disruption that may or could have happened if we went in a different way. But – Well, on February 9th, February 10th, it would have been potential disruption. Right, but we have the benefit of actual – and there was no evidence of disruption offered. None. No affidavits. None. Three parents not wanting to sign up for a class, there's not a disruption? People not wanting to – the parents not wanting their kids to be taught by her, there's not a disruption? The only – so if that's evidence, it's scintillative evidence because here's all you had in the record. All you had in the record was the school district said, if you don't want her, let us know, we'll give you someone else. No questions asked. Well, that's a tremendous – That is a disruption the school district begged for. And why do we know that? Because they allowed her to teach three classes, which she taught without incident, for an entire academic year. But I do want to go back to this court. Just last September, after Judge Roof ruled, spoke about the test, and they embellished it, and it's so much clearer. And Judge Roof didn't apply the right test, and she didn't have the benefit of Doherty. So on the employee side of the scale, you must consider the interests of the employee and the public in the speech. And incidentally, speech among nine people is speech. Speech on CNN, well, that's speech too. But a blog is speech. She had every right to blog, and the nine people who were reading her blog were doing speech. So what's of such public concern in what she put in the blog? It doesn't have to be of such concern. It's those modifiers that are the problem. What is of public concern that she had in the blog in which she was relating? Excuse me. Let me ask a question. Relax. Will you relax? We're just in court here deciding a case. What was of public concern about what she felt toward her stupid, brat-like students, or however she described them? The fact that her experiences in this public school informed her opinion as a teacher with experience was extremely important, not only to the nine people reading her blog, who those nine people tended to be other educators venting, but also to the press that wanted to hear about it. And it is in the record. It should have been in the record, I guess, with transcripts. But it is in the record what she spoke about in those interviews. When she spoke about the education debate, it's very serious. And that is her view that parents and administrators tell students who don't want to work hard and put pressure on the teachers to give grades to folks that don't earn them. And that's what she was talking about. That is the education debate. That's what was in the media. Now, you won't find in Doherty's explanation of the Pickering test anything about the context of the speech. The government doesn't regulate the context of the speech. The issue is her right to speak, the interest in the public. You look at context when you determine whether a matter is of public concern. It doesn't have to be necessarily political. It could be social or, as the Supreme Court said, or other concern. Or other concern. And that's what Doherty says. And it's weighed against the government's legitimate interest in promoting workplace efficiency and avoiding workplace disruption. The disruption that we've read about in Supreme Court cases, this is Garcetti. These are incidents where a deputy attacks his boss and then says, but if it's free speech to the press, I still get to work with you. And the court says, no, no, you're an alter ego of your boss. You can't work efficiently. A teacher isn't in the administration. Teachers in a public school have every right to criticize, every First Amendment right, to criticize the principal. And the principal may not like it, and the parents may not like it. And it doesn't affect, that fact doesn't affect the ability to teach the students. These students were taught, and they were taught by an individual who was deemed to be not just qualified, but outstanding until after the discovery. Thank you very much. Thank you to both counsel. Thank you. Both presented arguments. We'll take the matter under advisement. I would ask counsel to get together with the clerk's office and to have a transcript of this oral argument and to split the cost. Okay.